# CHICAGO, R. I. & P. RY. CO. v. WESTHEIMER & DAUBE.

### No. 3610.   Opinion Filed May 12, 1914.

### On Rehearing, November 24, 1914.

### (144 Pac. 356.)

1. **RAILROADS—Fences—Failure to Maintain—Injury to Stock —Liability.** It is the duty of every person or corporation owning or operating a railroad in Oklahoma to build and maintain a lawful fence along its right of way, "except at public highways and station grounds." Sections 1435 and 1438, Rev. Laws 1910. Where stock goes upon the right of way and is injured on account of the failure of the company to maintain such lawful fence, it is liable for stock killed or injured by its trains regardless of negligence in the running or management thereof.

2. **SAME—Injury to Stock on Track—Discovered Peril—Liability.** A railroad company owes the negative duty to the owner of stock trespassing upon its right of way to use ordinary care to avoid injury to such stock after their presence is discovered, and a failure to discharge this duty renders the company liable in damages for injury resulting therefrom.
(Syllabus by Galbraith, C.)

*Error from District Court, Carter County;*

*S. H. Russell, Judge.*

Action by Westheimer & Daube against the Chicago, Rock Island & Pacific Railway Company. Judgment for plaintiffs, and defendant brings error. Affirmed.

*C. O. Blake, H. B. Lowe, R. J. Roberts, W. H. Moore, J. G. Gamble,* and *Humphrey & Lester,* for plaintiff in error.

*J. C. Thompson,* for defendants in error.

Opinion by GALBRAITH, C. This was an action for damages on account of stock killed by one of the plaintiff in error's trains. The charging part of the petition, after alleging ownership and number of cattle and their value, proceeds:

"The said cattle were being pastured by the plaintiffs near the right of way of the defendant's railroad, about a mile west of

the town of Russet, Johnston county, Okla. That the defendant's agents and employees carelessly, negligently, and wrongfully, allowed the fence inclosing the right of way, which also inclosed the pasture in which the plaintiff's cattle were being pastured to be down, and that said eleven head of cattle went upon the defendant's right of way and railroad track, and that said defendant, the Chicago, Rock Island & Pacific Railway Company, in total disregard of the plaintiff's rights, carelessly, negligently, and wrongfully ran one of its engines and trains against and over said cattle and killed them; to the plaintiff's damage in the sum of $495."

The answer, after a general denial, proceeds:

"Further answering and for a separate defense said defendant states that if the eleven head of cattle, described in plaintiff's petition, were injured and killed at the time and place and in the manner alleged in plaintiff's petition, which is not admitted but expressly denied, such injury and killing was not occasioned by any negligence or carelessness on the part of this defendant, its agents, servants, or employees; but said defendant states that the right of way at the point where said cattle got upon the same was protected with a good and lawful fence, but that said plaintiff's cattle, including the ones that were killed and the others in the herd, were breachy and unruly cattle and were not such cattle as could be restrained by any reasonable fence; and that said cattle, because of their inherent vices and their breachy and unruly character, broke down said fence and got upon the defendant's right of way, through no negligence or carelessness of this defendant, its agents, servants, or employees, and were discovered by said defendant's employees in charge of said train upon said track too late to avoid striking them."

The plaintiffs filed a general denial by way of reply to the new matter set up in the answer. Upon the issues thus raised the cause was tried to the court and a jury, and a verdict returned for the plaintiffs in the sum of $440. To reverse this judgment the plaintiff in error has perfected an appeal to this court.

Error is assigned, first, in overruling the motion for a new trial, and, second, in entering judgment in favor of the defendants in error and against the plaintiff in error. Under these assignments, it is argued that the verdict is not supported by suf-

ficient evidence, and is contrary to law, and that certain instructions given to the jury were prejudicial.

It will be observed from the issues formed by the pleadings that the plaintiffs base their right of recovery: First, upon the negligence of the railway company in failure to discharge its statutory duty to construct and maintain a lawful fence along its right of way; and, second, on account of the negligent operation of its train, which resulted in killing the stock.

It appears from the evidence that the plaintiffs' cattle were being pastured in an inclosure, the south line of which was the fence constructed by the railway company on the north side of its right of way along the inclosure; that this was a four-wire fence, and, presumably, a lawful fence, as defined by the statute, although the evidence does not clearly tend to show this. The evidence of the plaintiffs tended to show that this fence had been neglected, and that some of the staples were pulled out of the posts, and the wire was hanging loose at a point east of the gate leading into the pasture from the right of way, and that the two top wires were down and one post was out, and through this opening the cattle passed from the pasture out upon the right of way. This evidence was contradicted by the evidence offered on behalf of the railway company, but there was sufficient evidence to sustain the plaintiffs' contention, if the jury found for them. It was practically conceded that eleven head of cattle were killed and that their value was $45 per head. If the jury found in favor of the plaintiffs on their first contention, then the verdict of the jury could be sustained regardless of the fact of negligence in the management of the defendant's train. In that event the company was liable for value of the cattle killed. *Midland Valley Ry. Co. v. Hardesty*, 38 Okla. 559, 134 Pac. 400; *St. L. & S. F. R. Co. v. Steele*, 37 Okla. 536, 133 Pac. 209. As to whether or not there was negligence in the operation of the train that killed the cattle the evidence was also conflicting. However, the evidence showed that the train which caused the injury was the west-bound passenger train operated between Hailey-

ville and Ardmore; that the accident occurred near Russet, in Johnston county, at about 8 o'clock in the evening of December 17, 1910; that the moon was not shining, but it was, as some of the witnesses termed it, a "starry night"; that the first animal was struck about ten or fifteen feet east of a certain culvert; and that east of this culvert, some 200 yards, there was a cut; and that the track slightly curved to the right from the cut to the culvert, but from the culvert on for some distance was straight, and it was a little up grade. The engineer testified that he saw the cattle on the track as soon as he came out of the cut east of the culvert, and that they were then about 150 feet in advance of the engine; that he immediately sounded the stock alarm whistle, and applied the emergency brake, and the train, consisting of an engine, tender, baggage car, and two coaches, was running at about 30 miles an hour, and could be stopped in 350 or 400 feet after applying the emergency. The evidence shows that this culvert east of which the first animal was struck by the engine was 25 or 30 feet in length, and that the train stopped some 500 or 600 feet west of the culvert, but before it stopped the front trucks of the engine were off the track and ran some 80 feet over the ties.

The section foreman, who testified on behalf of the company, stated that he arrived at the place of the accident about an hour after it occurred, and that the dead, dying, and mangled cattle were scattered along the track for 800 feet.

The fireman on the engine testified, in part, as follows:

"Q. Were you on the engine at the time of an accident to certain cattle west of Russet? A. Yes, sir. Q. What first attracted your attention to those cattle? A. The engineer using the emergency brake. Q. What were you doing? A. Putting in fire. Q. What sort of night was it? A. Pretty dark. 'Q. What time was it? A. I don't remember. We were right on time, about 8 o'clock. We are due out of Randolph at 7:30. Q. What sort of track is it there? A. Curved. Q. Which direction? A. Curves to the right, going west. Q. What do you mean by putting on the emergency? A. It is used as an emergency brake, something they don't use only when they have to stop quick. Q. What

is the effect of putting on the emergency?  A. A quick stop, as quick as you can make.  Q. What did you do immediately after your attention was attracted?  A. I jumped up to the window to see what was the matter.  Q. What did you see?  A. Saw a bunch of cattle ahead of the engine.  Q. How far?  A. About 50 or 75 feet.  Q. You have traveled over that road a number of times?  A. Yes, sir.  Q. Have you noticed the road at that point?  A. Not particularly.  Q. How far was it possible to have observed those cattle at the point where they were standing on that evening?  A. Well, after night it wouldn't be very far, not over a couple of hundred feet.  Daytime, you might see a little further.  Q. Just state what happened after you looked out of the window.  A. That the cattle all rushed to the track, and we hit one just before we hit the little bridge, and they bunched on the bridge, and we went into the bunch.  Q. What kind of bridge is it?  A. A fireproof bridge the cattle could go across.  Q. Did you hit any after you crossed the bridge?  A. I don't think so.  Q. After you hit the cattle was there anything on the rails?  A. What do you mean by that?  Q. Blood and hair on the rails?  A. Certainly.  There were five or six head went under it.  They were torn all to pieces, and it caused blood and hair to be on the rails.  Q. How far was it until the train stopped?  A. About 300 to 350 feet from the time they used the emergency brake.  Q. What speed was the train running that night?  A. I should judge 30 miles an hour."

On cross-examination he testified:

"Q. You say, do you know where that cut is east of the culvert?  A. There is a small cut there.  Q. That is where the brake was first applied?  A. Just a little this side of that, I think.  Q. That is when the engineer had discovered the cattle on the track?  A. He discovered the cattle about 150 feet from the bridge.  Q. When he came out of that cut is when he applied the air?  A. I didn't notice the cut at all.  Q. You are familiar with the road?  A. Yes; it is on the engineer's side, going west.  There is no cut on the left-hand side; there is just merely a small cut out of the bank.  Q. You carried these cattle that you hit all across the culvert?  A. Some of them went in.  Q. All dumped off on the east side of the culvert?  A. No, there were six under the train, I think, after we stopped.  Q. Now, what distance can you stop such a train as that in?  A. It depends on the rail and speed.  I think 350 or 400 feet at 30 miles an hour would be a good stop."

The location of this culvert, its width and location of the cut east of it, and the place where the train actually stopped west of the culvert are physical facts that possibly had great weight with the jury and enabled it to find that there was negligence in the operation of the train. These facts established by the evidence would justify a finding that the railroad company was negligent in the operation of its train, inasmuch as the train could have been stopped within a distance of 350 feet after the emergency brake was applied, and it was not stopped within that distance after it is claimed the emergency was applied.

The engineer testified that he saw the cattle on the track as soon as he came out of the cut east of the culvert and they were 150 feet in advance of the engine, and that he immediately applied the emergency brake and sounded the stock alarm whistle. If that were true, the train could have been stopped before it reached the culvert, where the first animal was struck, since it was over 400 feet from the west end of the cut to the east end of the culvert. The train was not actually stopped until it ran some 400 feet west of the culvert, and for the last 80 feet of this distance the front trucks of the engine were off the rails and ran over the ties. The evidence would clearly justify the finding that the engineer did not use ordinary care in attempting to avoid the accident after he saw the cattle on the track in advance of his engine, and was therefore negligent. *A., T. & S. F. Ry. Co. v. Henderson,* 27 Okla. 560, 112 Pac. 986.

Complaint is made of instructions 2, 3, and 4 given by the court to the jury. These instructions simply embody the statute prescribing the duty of the railroad company in regard to constructing and maintaining a fence along its right of way. This issue was clearly raised by the pleadings, and these instructions were proper.

Complaint is also made of instruction No. 12, which reads as follows:

"It is your province to determine from all the facts and circumstances in evidence whether or not the engineer in charge of defendant's train did discover, or could have, by the use of ordi-

nary care and diligence and watchfulness, discovered the cattle upon the track, at a point from the place where they were struck of sufficient distance for said engineer, by the use of all the appliances at his command, to have stopped said train, and thereby prevented the killing of said cattle, and if you find that he discovered the cattle in time to have stopped the train and did not do so, and by reason thereof said cattle were killed, then the plaintiff is entitled to recover, but if you find that he discovered said cattle as soon as it was possible for him to do so, in the use of the care and watchfulness required of him, and that he immediately did all in his power to stop said train, and prevent the injury to said cattle, and was unable to do so because the distance was too short to stop said train, then, although said cattle were killed, the defendant company is not liable, and your verdict should be for the defendant."

This instruction was clearly erroneous. However, although the language used therein does not embody a correct statement of the rule of law applicable to the issue, yet, when applied to the evidence before the jury, it could not have misled them to believe their duty was different from what it actually was, and for that reason giving this instruction was not prejudicial error. *Big Jack Mining Co. v. Parkinson*, 41 Okla. 125, 137 Pac. 678.

It was said by this court:

"When stock are upon the premises of a railway company or of a private owner, he owed only the negative duty to avoid injury to them which the exercise of ordinary care at that time would prevent." (*A., T. & S. F. Ry. Co. v. Davis & Young.* 26 Okla. 359, 109 Pac. 551; *M., K. & T. Ry. Co. v. Savage,* 32 Okla. 376, 122 Pac. 656.)

The engineer owed only the duty to use ordinary care to prevent injury to the cattle after he discovered their peril. The evidence shows that the engineer did discover the cattle on the track in advance of his engine as soon as it passed out of the cut, and, owing to the physical obstructions, he could not have seen them earlier. The fact that the train was not stopped within 400 feet of the place where the engineer saw the first of the cattle would support a finding that he did not use ordinary care to prevent the accident and did not apply the emergency brake as

soon as he discovered the peril of the animals, and was therefore negligent.

Whether the railroad company was negligent either in failing to maintain a lawful fence or in the management of its train resulting in the damage to defendants in error, one or both, were questions of fact for the determination of the jury, and, since there is sufficient evidence to sustain the finding on either ground, under the established and often repeated rule in this jurisdiction, there being no prejudicial error in the instructions of the court given to the jury, the verdict is conclusive and should be affirmed.

### ON REHEARING.

The original opinion filed herein affirming the judgment appealed from is, in all things, adhered to.

By the Court: It is so ordered.