## TATE et al. v. COALGATE STATE BANK et al.

No. 9105—Opinion Filed April 29, 1919.

(180 Pac. 687.)

(Syllabus.)

1. **Appeal and Error—Verdict on Conflicting Evidence — Want of Evidence—Review.**

While it is the settled rule in this court that a verdict based upon conflicting testimony will not be disturbed where there is evidence reasonably tending to support such verdict, yet, in a case where there is no competent testimony reasonably tending to support a verdict and judgment, it will be reversed.

2. **Same—"Evidence Reasonably Tending to Support Verdict."**

The clause, where there is evidence reasonably tending to support a verdict, means evidence that is competent, relevant, and material and which to a rational and impartial mind naturally leads or involuntarily tends to lead to a conclusion—to a verdict—for which there is a valid, just, and substantial reason, and not one that is based upon an unfounded suspicion or is the result of a mere chimerical conjecture.

Error from County Court, Coal County; H. E. Cullom, Special Judge.

Action by the Coalgate State Bank against W. B. Tate and the Central Supply Company and another. Verdict and judgment for plaintiff, and the named defendants bring error. Reversed and remanded.

Burns & Toney, for plaintiffs in error.

E. N. Holland, for defendants in error.

HARRISON, J. This action was begun in the county court of Coal county by the Coalgate State Bank against W. H. Graham, W. B. Tate, and the Central Supply Company to recover a balance of $438 and interest due on a $750 note given by W. H. Graham to said bank. Neither W. B. Tate nor the Central Supply Company signed the note, nor is there any evidence that either the Central Supply Company or W. B. Tate had any knowledge of the making of said note or of the acceptance of same

by the bank, until after this suit was begun; but W. B. Tate and the Central Supply Company were made defendants in the case because it was alleged in the bank's petition that Tate was a silent partner of Graham in certain well-drilling contracts, and that the Central Supply Company which was owned by Graham and his alleged silent partner, Tate, was organized for the purpose of covering up their individual assets and preventing their creditors from enforcing collections against the individual assets of Tate and Graham, and further alleging that the note made by Graham was contracted for the use of himself and his codefendant, Tate.

There were other parties, by intervention, whose rights, however, are immaterial to a determination of the questions presented here.

Tate filed his separate answer, containing a general denial, and further denying any knowledge of the execution of the note or of any payments made thereon, and also denying that he was a partner of W. H. Graham in the well drilling contracts and that he received any benefits of the proceeds of said note.

The Central Supply Company filed its separate answer, similar in effect to that of Tate's.

At the time of filing the suit, the bank procured an attachment against certain well-drilling machinery and tools. Tate, as president of the Central Supply Company, filed motion to dissolve the attachment on the grounds that the property attached did not belong to Graham, but belonged to the Central Supply Company. Tate also filed his individual motion to dissolve the attachment.

Both motions were overruled, and the case was tried upon the issues formed by the pleadings, resulting in a verdict and judgment in favor of the bank for the balance due on the note together with interest and attorney's fees. From such judgment and order overruling motion for new trial, Tate and the Central Supply Company appealed to this court.

There appears to be but one question necessary to determine, viz., the sufficiency of the evidence. The evidence is not set out in the briefs, at least as fully as it might have been; but we have examined the record closely and carefully and have been unable to find any competent testimony supporting any of the material allegations of the petition that Tate was a silent partner of Graham, that Tate had any interest in the note or received any benefit from the

proceeds of the note, or that the bank relied upon Tate or the Central Supply Company at the time it accepted the note signed by Graham, nor any testimony in support of the allegations that the Central Supply Company was organized as a corporation for the purpose of covering up the individual assets of Tate and Graham and thereby defeating their creditors, nor is there any evidence that Tate individually or jointly with Graham had any creditors, nor any evidence that the Central Supply Company either as a corporation or jointly with Graham had any creditors or any joint obligations with Graham. On the other hand, Tate testified positively that he was not individually indebted to the bank in any sum and never had been, and as president and manager of the Central Supply Company he testified that the Central Supply Company was not indebted to the bank in any sum whatever and never had been, that he had never seen the note or heard of it until after the suit was brought; that neither he as an individual nor the Central Supply Company as a corporation had received any of the proceeds of the $750 note; that he did not know whether the note was given as an indebtedness of Mr. Graham to the bank, and knew nothing about the note until the suit came up. He testified positively that the property attached belonged to the Central Supply Company, that it had been leased by the Central Supply Company under a written contract to Graham at $50 per month, and that Graham was using said drilling outfit in fulfilling some well-drilling contracts which Graham, as an individual, had with some oil companies and that neither Tate nor the Central Supply Company had any interest in Graham's contracts with the oil companies. The lease contract in question was introduced in evidence.

Tate testified that the Central Supply Company was not organized for the purpose of defrauding his creditors nor Graham's creditors, nor to cover up his property nor Graham's property, and introduced the articles of incorporation which show that the corporation was organized and the articles filed with the Secretary of State in February, 1915. A copy of the note sued upon is also in the record, showing that it was executed and delivered to the bank and accepted by the bank on January 5, 1916, almost a year after the company was organized.

There is no evidence that the bank relied upon Tate or the Central Supply Company when it accepted the note signed by Graham, nor any evidence that Graham repre-

sented to the bank that he had an interest in the Central Supply Company, nor that he and Tate were jointly interested in the proceeds of the note, or that either Tate or the Central Supply Company would receive any of the proceeds of the note.

Mr. J. G. Loving, cashier of the bank, who made the loan and accepted the note, stated:

"Mr. Graham made an application for the loan, and I questioned him as to how he wanted to fix the note, and he told me that this property belonged to him, and that he would give me a chattel mortgage on it, and after he told me that, and as long as the property remained here in the county, I thought it would be all right, and that we would be protected."

This is the bank's testimony as to the representations made by Graham upon which representations the bank accepted Graham's note. Mr. Loving admitted also upon cross-examination that the drilling contracts which Graham had with other oil companes were in the bank and had been assigned by Graham to the bank for the purpose, as Mr. Loving testified, of securing any indebtedness which Graham might have to the bank. It does not appear that Graham had any other indebtedness to the bank except the note in question, and Mr. Loving admitted that such assignments of drilling contracts by Graham was partly the reason why he did not take a chattel mortgage. Loving further admitted that, at the time the note was signed by Graham and accepted by the bank, Graham had on deposit in escrow with the bank $2,500, which amount had been placed in escrow with the bank by the oil companies with their drilling contracts with Graham, and that Graham assigned his equity in these contracts and in the $2,500 deposit to the bank.

Under the evidence in the record, aside from the positive testimony of Tate, the testimony of the bank itself clearly refutes the allegations in the petition that either Tate or the Central Supply Company were relied upon by the bank, or that either of them received any benefits from the proceeds of the note. or that either of them had any knowledge of the execution of the note.

The articles of incorporation disprove the charge that the corporation was organized for the purpose of defeating Graham's indebtedness to the bank, for they show that the corporation was organized almost a year before Graham became indebted to the bank, and there is no evidence that either Tate or the Central Supply Company had any knowledge of Graham's indebtedness to the bank until after suit was brought.

There was ample positive testimony that the property attached belonged to the Central Supply Company and no competent evidence to the contrary.

We are of the opinion that the court erred in overruling the motion to dissolve the attachment and also erred in refusing to set aside the verdict and grant a new trial. Aside from the merest insinuations and suspicions for which no reason is given, there is absolutely no testimony sustaining the allegations of the petition to the effect that Tate was a silent partner and that the company had been organized for the purpose of defeating Tate and Graham's creditors.

In such a case, it was the duty of the court to dissolve the attachment and to set aside the verdict of the jury and grant a new trial. This court has gone as far as the courts of last resort of any of the states in recognition of the rule that a verdict found upon conflicting testimony will not be disturbed where there is any testimony reasonably tending to support such verdict and in recognition of the rule that the province of weighing testimony and adjudging the credibility of the witnesses belongs exclusively to the jury.

But while it has followed this rule as far as possible as reason and justice will permit, yet in so doing it has not signified that it will decline to reverse a judgment that is not supported by any evidence.

In E. M. Brash Cigar Co. v. Wilson, 32 Okla. 153, 121 Pac. 223, it is said:

"A verdict or judgment on the facts will not be disturbed by this court if there is any evidence reasonably tending to support same; but, on the other hand, if there is a total absence of any testimony upon which a judgment might reasonably be based, such judgment will be reversed."

See, also, Lucke's Estate, Consor v. Andrew, 61 Ore. 483, 123 Pac. 47; T. S. Reed Grocery Co. v. Miller, 36 Okla. 134, 128 Pac. 271; Conwill v. Eldridge, 35 Okla. 537, 130 Pac. 912; Cedar Rapids Nat. Bank v. Bashara, 39 Okla. 482, 135 Pac. 1051; City of Duncan v. Tidwell, 48 Okla. 382, 150 Pac. 113.

The clause, where there is evidence reasonably tending to support a verdict, means evidence that is competent, relevant, and material, and which to a rational and impartial mind naturally leads or it involuntarily tends to lead to a conclusion—to a verdict—for which there is valid, just, and substantial reason, and not one that is based upon an unfounded suspicion or is the result of a mere chimerical conjecture.

The verdict herein is not supported by any competent, relevant and material testimony.

The judgment is therefore reversed and cause remanded.